

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-11-1998

# Abbott v. Latshaw

Precedential or Non-Precedential:

Docket 97-3460

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Abbott v. Latshaw" (1998). *1998 Decisions.* Paper 276.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/276

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed December 11, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-3460

MARK ABBOTT,
        Appellant

v.

LAURIE J. LATSHAW, ALBERT DIEHL, DENNIS GEORGE,
ROBERT STAFFORD and DONALD SARSFIELD

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
(D.C. Civil No. 96-803)

Argued Under Third Circuit LAR 34.1(a)
June 11, 1998

Before: STAPLETON, COWEN, AND RENDELL,
Circuit Judges

(Opinion Filed: December 11, 1998)

        David J. Millstein (ARGUED)
        Jacquelyn A. Knupp
        Millstein & Knupp
        P.O. Box 467
        Youngwood, PA 15697-0467
         Attorneys for Appellant

Christopher K. McNally (ARGUED)
Murphy Taylor, P.C.
326 Third Avenue
Pittsburgh, PA 15222
 Attorney for Appellees,
Dennis George, Robert Stafford
and Donald Sarsfield

John K. Greiner (ARGUED)
Belden, Belden, Persin & Johnston
117 North Main Street
Greensburg, PA 15601
 Attorney for Appellee,
Albert Diehl

OPINION OF THE COURT

RENDELL, Circuit Judge:

On the evening of April 23, 1996, Laurie Latshaw telephoned Constable Albert Diehl and enlisted his aid in her plan to take a van from her former husband, Mark Abbott, the next day. Although Latshaw recovered the van, her plan was less than successful in that Abbott then filed an action under 42 U.S.C. S 1983 against her, Diehl, and three Greensburg, Pennsylvania, police officers who arrived on the scene to assist the constable, for violation of his Fourteenth Amendment right to procedural due process. The district court granted summary judgment and dismissed Abbott's claim against all of the defendants, determining that the law enforcement officers were entitled to qualified immunity, and that both the pleadings and the evidence failed to implicate Latshaw in any state action. Abbott appeals the district court's dismissal of hisS 1983 claim against all of the defendants, as well as its denial of his motion to add a claim alleging a violation of the Fourth Amendment. We will affirm summary judgment in favor of Officer Sarsfield and Officer Stafford of the Greensburg police department on qualified immunity grounds, but will reverse dismissal of Abbott's S 1983 claim against Diehl, Lieutenant George of the Greensburg police, and Latshaw.

2

We will also reverse the district court's denial of leave to amend the complaint.

I. BACKGROUND

Mark Abbott and Laurie Latshaw were married from 1983 until 1993. Latshaw's father, Dale Feather, purchased a van with "GMAC" financing in 1989, and received a Commonwealth of Pennsylvania certificate of title issued in his name. On November 18, 1991, Feather and Abbott signed a Bill of Sale in which Feather agreed to "grant[ ], sell[ ], convey[ ] and deliver[ ]" the van to Abbott "free and clear of all liens and encumbrances . . . subject to the Purchaser paying all of the loans and encumbrances levied against" it. Thereafter, Abbott and Latshaw used the van, but its title and registration remained in Feather's name.

Abbott retained sole possession of the van after he and Latshaw were divorced in 1993. He had completely paid off the GMAC loan on February 25, 1994, but chose not to transfer the van's title and registration to his own name because by doing so he would have forfeited the van's non-transferable warranty.

On April 23, 1996, Feather assigned the van's title to his daughter by writing her name and address on the reverse side of the Certificate of Title alongside his notarized signature. The next day, Latshaw took the document to Greensburg where a title service reissued the van's registration in her name. She then telephoned Albert Diehl, a Westmoreland County constable, and informed him "that [she had] the title to the car, it is signed over to [her] and that [she] needed help in retrieving it from Mark Abbott." She expected the constable to "tell Mark that, yes, the [van] was [hers] and [she] could take it and that was it." Latshaw admits that she contacted Diehl in his capacity as a constable. She also testified that she paid him for his services.1

_____

1. The transcript of Latshaw's deposition reads as follows:

Q. Now, when you contacted Al Diehl, you were cont acting him as a constable; is that correct?

3

On April 25, 1996, Latshaw and Diehl met outside Abbott's chiropractic office in Greensburg. Neither of them had notified Abbott of the impending seizure. As proof that she owned the van, Latshaw showed the constable the Pennsylvania certificate of title issued in her father's name and bearing a notarized assignment to her, a temporary registration issued in her name, temporary license plates, and an insurance card indicating that the van was insured by a policy issued to James P. Latshaw, presumably her husband.

Convinced that Latshaw was entitled to immediate possession of the van, Diehl approached Abbott, identified himself as a constable, and asked him if he would give Latshaw the keys to the van. Abbott refused. He insisted that he had paid for the van, had driven it for seven years, and had a bill of sale at home establishing that he owned it. Abbott asked if he could drive the van home to get the proof of ownership, but Diehl threatened to arrest Abbott if he drove off in "her vehicle." Abbott then telephoned David Harr, the attorney who had represented him in the sale transaction with Feather. Harr told Diehl that the bill of sale existed, and warned the constable that he would be held liable if he helped Latshaw take the van.

Shortly thereafter, Diehl telephoned the Greensburg police and requested that an officer come to the scene to review Latshaw's documentation. Lieutenant Dennis George, Officer Robert Stafford, and Officer Donald Sarsfield of the Greensburg police arrived on the scene in response to the call. They reviewed Latshaw's paperwork and confirmed by radio that the van was in fact registered

_____

A. Yes, I was.

Q. And did you pay him for his services?

A. Yes, I did.

Q. How much did you pay him?

A. $ 40.

(Latshaw Dep. at 13-14).

4

to Dale Feather. One of them told Latshaw she was entitled to immediate possession of the van.

David J. Millstein, Abbott's current counsel, arrived at the scene at about this time. He spoke briefly to Diehl, and then entered into a heated discussion with Lt. George in which he vehemently opposed the seizure. When words proved ineffective, Millstein took action. By then, a locksmith whom Diehl had recommended to Latshaw had cut a key to the van. Millstein boxed the van into its parking space with his car in order to prevent Latshaw from driving it out of the parking lot. According to the police report submitted by Stafford, Lt. George then threatened to arrest Millstein if he did not make way for the van. When Millstein refused to do so, Lt. George told him that he was under arrest. The Greensburg police officers then issued him a summary citation for disorderly conduct and briefly detained him in a police car. Meanwhile, Latshaw managed to maneuver the van around Millstein's car and drove off.

Abbott commenced a 42 U.S.C. S 1983 action against Diehl, the Greensburg police officers, and Latshaw, claiming that they deprived him of property under color of state law without due process. The district court had jurisdiction pursuant to 28 U.S.C. SS 1331 and 1343(a)(3), and 42 U.S.C. S 1983. Abbott now appeals from the July 21, 1997, final order of the district court granting summary judgment on qualified immunity grounds in favor of Diehl and the Greensburg police officers, dismissing hisS 1983 claim against Latshaw for lack of state action, and denying him leave to amend his complaint to include an alleged violation of the Fourth Amendment.

We have jurisdiction to review the final order of the district court under 28 U.S.C. S 1291. In reviewing an order of summary judgment predicated on qualified immunity grounds, we exercise plenary review over the district court's legal conclusions. See Kornegay v. Cottingham , 120 F.3d 392, 395 (3d Cir. 1997). We will affirm summary judgment if, after drawing all reasonable inferences from the underlying facts in the light most favorable to the non-moving party, we conclude that there is no genuine issue of material fact to be resolved at trial, and that the moving party is entitled to judgment as a matter of law. See id.

## II. DISCUSSION

The district court held that although Abbott asserted a property interest upon which a S 1983 claim for violation of procedural due process may be predicated, qualified immunity shields the officers from potential liability for their role in the seizure. We agree with the finding that the officers were state actors and effected a constitutional deprivation, but part company with the district court on the issue of qualified immunity.

### A. 42 U.S.C. S 1983

Section 1983 provides a cause of action for violations of federally secured statutory or constitutional rights"under color of state law." 42 U.S.C. S 1983. See West v. Atkins, 487 U.S. 42, 48 (1988). Abbott alleges in his S 1983 claim that Constable Diehl and the Greensburg police officers violated his Fourteenth Amendment right to procedural due process by using the authority vested in Pennsylvania law enforcement officers to deprive him of property without prior notice and an opportunity to be heard. If their conduct satisfies the state action requirement of the Due Process Clause, then it also qualifies as action"under color of state law" for S 1983 purposes. See Lugar v. Edmondson Oil Co., 457 U.S. 922, 935 n.18 (1982).

### 1. Constable Diehl and the Greensburg Police Officers

Where, as here, defendants have successfully raised the shield of qualified immunity in a S 1983 action, an appellant trying to reverse summary judgment bears the initial burden of showing that the defendants violated a clearly established statutory or constitutional right. See Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997) (citing In re City of Phila. Litig., 49 F.3d 945, 961 (3d Cir. 1995)). In particular, Abbott must establish that the officers were acting as state actors when they deprived him of a property interest to which he had a legitimate claim of entitlement without the process he deserved.

### a. State Action

State action is a threshold issue in a Fourteenth Amendment claim. "[T]he deprivation must be caused by

6

the exercise of some right or privilege created by the State
. . . or by a person for whom the state is responsible," and
"the party charged with the deprivation must be a person
who may fairly be said to be a state actor." Lugar, 457 U.S.
at 937. The traditional definition of action under color of
state law is similar, and requires that one liable under
S 1983 "have exercised power `possessed by virtue of state
law and made possible only because the wrongdoer is
clothed with the authority of state law.' " West, 487 U.S. at
49 (quoting United States v. Classic, 313 U.S. 299, 326
(1941)).

We need not dwell on whether Diehl and the Greensburg
police officers were state actors. They were clearly invested
with the power and authority of the state when they
assisted Latshaw, and "state employment is generally
sufficient to render the defendant a state actor." Lugar, 457
U.S. at 935 n.18. In Pennsylvania, constables are elected
public officials with prescribed duties and liabilities, see 13
Pa. Cons. Stat. Ann. SS 1, 41, 45 (1998), and we likewise
consider police officers to be a "set of state actors."
Michigan v. Jackson, 475 U.S. 625, 634 (1986). Diehl
admits that he acted as a constable, and identified himself
as such to Abbott. The other officers arrived on the scene
in response to Diehl's call for assistance, and were on duty.
All four law enforcement officers were clearly state actors.

b. Deprivation of a Constitutional Right

It is elementary that procedural due process is implicated
only where someone has claimed that there has been a
taking or deprivation of a legally protected liberty or
property interest. See Board of Regents v. Roth , 408 U.S.
564, 569 (1972). It is also well established that possessory
interests in property invoke procedural due process
protections. See Fuentes v. Shevin, 407 U.S. 67, 87 (1972).
In Fuentes, the Supreme Court struck down as
unconstitutional Florida and Pennsylvania prejudgment
replevin procedures used by creditors to recover household
goods purchased under conditional sales contracts and on
which payments were allegedly overdue. "Clearly their
possessory interest in the goods, dearly bought and
protected by contract, was sufficient to invoke the

protection of the Due Process Clause." Id. at 86-87 (footnote omitted).2 It is equally clear that Abbott's possessory interest in the van he had driven for seven years invoked the protection of the Due Process Clause.

At the core of procedural due process jurisprudence is the right to advance notice of significant deprivations of liberty or property and to a meaningful opportunity to be heard. See LaChance v. Erickson, ___ U.S. ___, 118 S. Ct. 753, 756 (1998); Boddie v. Connecticut, 401 U.S. 371, 379 (1971). Prior notice is not, however, absolutely necessary so long as other procedures guarantee protection against erroneous or arbitrary seizures. See Mitchell v. W. T. Grant Co., 416 U.S. 600, 605-606 (1974); Finberg v. Sullivan, 634 F.2d 50, 58 (3d Cir. 1980) (en banc). In Mitchell, the Court upheld a Louisiana statute requiring creditors to obtain judicial approval, post a bond, and submit a verified petition or affidavit before they sequestered property without notice from debtors entitled to seek immediate dissolution of the writ or to regain possession of the sequestered goods by filing a bond. Comparable procedures did not protect Abbott here. The Court has also found prior notice unnecessary in rare cases where (1) a seizure was directly necessary to secure an important governmental or general public interest, (2) there was a special need for very prompt action, and (3) "the State has kept strict control over its monopoly of legitimate force: the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in a particular instance." Fuentes, 407 U.S. at 91. This rare exception to the general requirement of providing notice before state action deprives an individual of a protected property interest is also inapplicable here.

_____

2. The defendants argue that Abbott had no property interest in the van because he did not list it among his assets in a prior bankruptcy proceeding, and is therefore judicially estopped from claiming he owns it. They also contend that his ownership of the van was uncertain because it was not explicitly awarded to him in the divorce proceedings. Because deprivation of a possessory interest alone invokes the right to procedural due process, we need not consider these arguments as to who owned the van.

Abbott has a strong claim against Diehl for violating his right to procedural due process by failing to give him advance notice and an opportunity to be heard prior to Latshaw's seizure of the van. The constable played a principal role in the seizure. Latshaw enlisted him, and paid for his help because she believed that she could not take the van from Abbott without it. According to Abbott, "Mr. Diehl walked into my office and identified himself as a constable and told me that he was [there to take my vehicle," and that "we're going [to] take the vehicle one way or another." The constable threatened to arrest Abbott for driving "her vehicle" if he tried to drive the van home. Viewing the record in the light most favorable to Abbott, we find that a reasonable jury could conclude that Diehl used his public authority to help Latshaw take possession of the van, and as such was obligated to notify Abbott of the seizure in advance and to provide him with a meaningful opportunity to be heard.

The Greensburg police officers were called to the scene to check Latshaw's documentation, which they did. There is no evidence that two of the officers -- Sarsfield and Stafford -- did any more than this. The mere presence of police at the scene of a private repossession does not, alone, constitute state action causing a deprivation of a protected property interest. In Menchaca v. Chrysler Credit Corp., 613 F.2d 507 (5th Cir. 1980), the Fifth Circuit Court of Appeals declined to find state action on the part of police officers who arrived at the scene of a self-help repossession in response to a report regarding a disturbance, maintained the peace, but did not take sides or assist the private repossessor in any way. Id. at 511-13. Officers Sarsfield and Stafford confined their conduct to the routine police procedures of checking the vehicle registration, and cannot be said to have used state action to deprive Abbott of his due process rights. See United States v. Coleman , 628 F.2d 961, 964 (6th Cir. 1980) (acquiescence by police does not transform private acts into state action; police presence is not necessarily encouragement). However, Lieutenant George did not remain neutral, but advised Latshaw that she had a right to immediate possession of the van. Lt. George also ignored Millstein's ardent protest of the seizure, and threatened to arrest Millstein if he did not

9

move his car to make way for Latshaw. Although he was not the instigator, a jury could find that Lt. George, by his conduct, joined forces with Diehl in the unconstitutional deprivation, going beyond the permissible conduct outlined in Menchaca. See, e.g., Booker v. City of Atlanta, 776 F.2d 272, 274 (11th Cir. 1985) (plaintiff can withstand summary judgment if jury could find that police involvement constitutes intervention and aid). This affirmative intervention and aid constitutes a sufficient basis for a reasonable trier of fact to find that Lt. George played a role in the seizure and resulting violation of Abbott's constitutional rights. Sarsfield and Stafford are therefore entitled to dismissal of the claims against them, but Lt. George is implicated in the constitutional violation.

2. Laurie Latshaw

Although not an agent of the state, a private party who willfully participates in a joint conspiracy with state officials to deprive a person of a constitutional right acts"under color of state law" for purposes of S 1983. See Dennis v. Sparks, 449 U.S. 24, 27-28 (1980); Adickes v. S. H. Kress & Co., 398 U.S. 144, 152 (1970); McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ., 24 F.3d 519, 524 (3d Cir. 1994) ("State action may be found if the private party has acted with the help of or in concert with state officials."). The district court dismissed Abbott's S 1983 claim against Latshaw sua sponte because it found that his complaint failed to allege a conspiracy between Latshaw and Diehl, and that "the record reveal[ed] no basis to infer that any such allegation could withstand scrutiny." Abbott had alleged in his complaint that Diehl acted "at the instance and request of Defendant Latshaw" and that Latshaw was thus "acting under color of state law" for purposes of the lawsuit. Further, the complaint depicted joint action by Latshaw and Diehl in effectuating the recovery of the van. This is not a case in which the complaint contains conclusory allegations of concerted action but is devoid of facts actually reflecting joint action. See, e.g., Fries v. Helsper, 146 F.3d 452, 458 (7th Cir. 1998), cert. denied, 67 U.S.L.W. 3106, 3151 (U.S. Oct. 13, 1998) (No. 98-219). Rather, the complaint easily satisfied

10

the standards of notice pleading; no more is required of a plaintiff in S 1983 cases. See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168-69 (1993). The district court's dismissal sua sponte was improper because the pleading contained sufficient allegations to withstand a motion to dismiss. Further, we find the court's conclusion that the record contained no facts which could support a conspiracy allegation to have been premature -- since no motion for summary judgment had been filed -- but also curious in light of the facts borne out by the evidence, including Latshaw's statement under oath that she contacted Diehl and that she paid him to help her take possession of the van. (See Latshaw Dep. at 14). We will therefore reverse the district court's sua sponte dismissal of Abbott's S 1983 claim against Latshaw.

B. Qualified Immunity

Qualified immunity shields public officials performing discretionary functions from S 1983 and Fourteenth Amendment liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Our qualified immunity inquiry thus proceeds in two steps. See Sharrar v. Felsing, 128 F.3d 810, 828 (3d Cir. 1997). First, we must determine whether the defendants violated "clearly established" rights. Second, we must decide whether, in light of the concrete, clearly established, and particular law applicable on April 25, 1996, and the information then available, a reasonable officer would have believed that the conduct of Diehl and/or the Greensburg police officers deprived Abbott of his right to procedural due process. See Anderson v. Creighton, 483 U.S. 635, 640-41 (1987); Reitz v. County of Bucks, 125 F.3d 139, 147 (3d Cir. 1997).

It is readily apparent that the applicable law regarding procedural due process was "clearly established" at the time of the alleged violation of Abbott's rights. As we noted earlier, the Supreme Court's 1972 decision in Fuentes held that due process protects possessory interests in property. 407 U.S. at 87. Thus, the law in this area was clear for at

11

least twenty-four years prior to the incident involving Abbott and the defendants.

However, resolution of the second element of the qualified immunity test is more complex. The district court determined that an objectively reasonable officer in the same situation would not have realized that the defendants were violating Abbott's rights, and ruled that Diehl and the Greensburg police officers were thus immune fromS 1983 liability for helping Latshaw. The court held that an officer who had reviewed Latshaw's documentation would reasonably have concluded that she was entitled to immediate possession of the van. Therefore, it found, Diehl and the Greensburg police officers could not have believed they were denying Abbott due process of law. We disagree.

The district court and the defendants rely heavily on the fact that under Pennsylvania law certificates of title represent "prima facie evidence of the facts appearing on the certificate." 75 Pa. Cons. Stat. Ann. S 1106(c) (1998). However, the district court and the parties have overstated the importance of Latshaw's documentation, while ignoring the established precedent of Fuentes as well as the overall context of the seizure.

At the heart of Fuentes is the principle that it is not for law enforcement officers to decide who is entitled to possession of property. Rather, it is the domain of the courts, and citizens are to have a meaningful opportunity to be heard as to their rights before they are finally deprived of possession of property. Diehl's curbside courtroom, in which he decided who was entitled to possession, is precisely the situation and deprivation of rights to be avoided. Diehl knew that Abbott had once been married to Latshaw and had been driving the van for seven years. Moreover, he had reason to believe -- based on the statements of Abbott, Harr, and Millstein -- that Abbott had a bill of sale at home to support his ownership of the vehicle. In his single-minded reliance on Latshaw's documentation, Diehl rode roughshod over Fuentes and ignored the broader context of the seizure which militated against the legality and reasonableness of his hasty conclusion that Latshaw, not Abbott, was entitled to immediate possession of the van. An official familiar with

12

the facts then known and the law then applicable would have reasonably believed that his conduct was violating clearly established law. As such, we conclude that the district court erred when it granted summary judgment in favor of Diehl on qualified immunity grounds.

We also conclude that an objectively reasonable officer would have realized the illegality of Lt. George's conduct. Reasonable police officers should know from the established precedent of Fuentes that their role is not to be participants in property deprivations without notice and an opportunity to be heard. There came a point during this incident when Lt. George's role changed from the protector of the peace to the enforcer. The Greensburg Police Department Supplemental Report indicates that Lt. George told Millstein that he would be arrested if he did not move his van, and states that, when Millstein refused to cooperate, Lt. George "grabbed" him by the arm and "told [him] that he was under arrest." (App. at 541). In light of Fuentes, we believe that a reasonable officer in Lt. George's position would have known that such behavior crossed the line of permissible conduct. We will thus reverse summary judgment on qualified immunity grounds as to Lt. George as well.

III. MOTION FOR LEAVE TO AMEND THE COMPLAINT

The district court denied Abbott leave to amend his complaint to include an alleged Fourth Amendment violation based on its findings that the defendants did not "seize" Abbott's van, and that a Fourth Amendment claim "would be futile in light of the defendant officers' right to qualified immunity under the circumstances." We review the district court's denial of leave to amend a complaint for abuse of discretion. See Lewis v. Curtis, 671 F.2d 779, 783 (3d Cir. 1982). However, we also recognize that"[i]f a district court concludes that an amendment is futile based upon its erroneous view of the law, it abuses its discretion." R.M. Smith v. National Collegiate Athletic Ass'n, 139 F.3d 180, 190 (3d Cir. 1998). Here, we find fault with both of the district court's rationales, and we conclude that the court abused its discretion in denying Abbott leave to amend.

13

First, in light of the Supreme Court's expansive view of the concept of "seizure" under the Fourth Amendment, as set forth in Soldal v. Cook County, Ill., 506 U.S. 56, 61-65 (1992) (a Fourth Amendment "seizure" of property "occurs when `there is some meaningful interference with an individual's possessory interests in that property,' " (citation omitted)), it is possible that plaintiff could in fact state a constitutional claim. Further, the district court's ruling as to qualified immunity, based as it is on the immunity issue relating to a due process violation, is not well-founded. The court opined that because qualified immunity applied to Abbott's due process claim, it necessarily would apply to his Fourth Amendment claim as well.3 Yet whether the defendants are entitled to qualified immunity from a claim under the Fourteenth Amendment is a wholly different inquiry from whether the defendants are entitled to qualified immunity from a Fourth Amendment claim involving the seizure of personal property. The latter inquiry involves whether, in light of clearly established Fourth Amendment law applicable on April 25, 1996, a reasonable officer in the position of Diehl and Lt. George would have believed that their conduct violated Abbott's Fourth Amendment rights. This issue has not even been raised, let alone analyzed. Leave to amend the complaint should have been granted.

IV. CONCLUSION

For the foregoing reasons, we will affirm the district court's order of summary judgment in favor of Officers Sarsfield and Stafford, but will reverse the grant of summary judgment as to Constable Diehl and Lt. George. We will also reverse the district court's dismissal of Abbott's S 1983 claim against Latshaw, and its denial of leave to amend the complaint, and we will remand to the district court for further proceedings consistent with this opinion.

_____

3. The district court made this determination without the benefit of any briefing by the parties. In opposing Abbott's motion for leave to amend, none of the defendants had argued that the amendment was futile because of the availability of a qualified immunity defense.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit